IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| TIMOTHY BOLT, | ) | CV. NO. 10-00071 PHX-DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HONEYWELL INTERNATIONAL | ) | |
| INC., a Foreign Corporation; | ) | |
| METROPOLITAN LIFE | ) | |
| INSURANCE COMPANY, a | ) | |
| Foreign Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER: (1) DENYING PLAINTIFF TIMOTHY BOLT'S
MOTION FOR SUMMARY JUDGMENT AND (2) DENYING WITHOUT
PREJUDICE PLAINTIFF TIMOTHY BOLT'S REQUEST
FOR AN AWARD OF ATTORNEY FEES

Pursuant to Local Rule 7.2(f), the Court finds this matter suitable for

disposition without a hearing.  After reviewing the motion and the supporting and

opposing memoranda, the Court **DENIES** Plaintiff Timothy Bolt's Motion for

Summary Judgment (Doc. # 41).  The Court also **DENIES WITHOUT**

**PREJUDICE** Plaintiff's Request for an Award of Attorney Fees.

BACKGROUND

Plaintiff Timothy Bolt ("Plaintiff" or "Bolt") seeks an order from this Court determining that Defendant Metropolitan Life Insurance Company ("MetLife") arbitrarily and capriciously terminated his disability payments under a long-term disability plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").

I.      Bolt's Benefits Under the ERISA Plan

Plaintiff was employed by Defendant Honeywell International, Inc. ("Honeywell") from 1996 until 2003.  ("AR," Docs. ## 25–35, at MetBCF000661.)  When Bolt left Honeywell in 2003 he was Manager of Information Technology.  (Id. at MetBCF000366.)  In this position he managed 129 employees, a budget of over 1.5 million dollars, and negotiated corporate wide contracts for service and support programs.  (Id. at MetBCF000366–67.)  He was also responsible for preparing and completing operations, productivity, tactical and strategic reports, budget oversight and planning.  (Id.)

In February 2003, Bolt resigned his position with Honeywell because of health problems.  ("Compl.," Doc. # 1, ¶ 11.)  His initial symptoms included significant pain, blindness in his left eye, blurred vision in his right eye, and numbness and weakness on the left side of his body.  (AR at MetBCF000661.)

2

Bolt's primary care physician, Dr. Jerry Shockey, said Bolt was "unable to work

w[ith] loss of vision."  (Id. at METBCF00591.)

At the time of Bolt's resignation, Honeywell had an ERISA-governed

Long Term Disability Benefit Plan (the "Plan").  (Id. at MetBPlan000001.)  The

Plan gave MetLife discretion to determine entitlement to benefits, (id. at

MetBPlan000054), and defined disability as follows:

> **Disabled or Disability** means that, due to Sickness or as a direct
> result of accidental injury:
> •   You are receiving Appropriate Care and Treatment and
>     complying with the requirements of such treatment; and
> •   You are, during the Elimination Period and the next 24 months
>     of Sickness or accidental injury:
>     •   Unable to earn more than 80% of Your Predisability
>         Earnings at Your Own Occupation from any employer in
>         Your Local Economy; and
>     •   Unable to perform each of the material duties of Your
>         Own Occupation;
> •   You are, after such period:
>     •   Unable to earn more than 80% of Your Predisability
>         Earnings at any gainful occupation for any employer in
>         Your Local Economy; and
>     •   Unable to perform the duties of any gainful occupation
>         for which You are reasonably qualified taking into
>         account Your training, education, and experience.

(Id. at MetBPlan000022.)  Thus, for the first twenty-four months of sickness or

accidental injury, disability is defined in terms of the insured's own occupation.

(Id.)  After the first twenty-four months, disability is defined as the insured's

3

ability to perform any gainful occupation for which the insured is reasonably qualified.  (Id.)  Disability, as defined under the Plan, also requires the insured to "receiv[e] appropriate care and treatment and [to comply] with the requirements of such treatment."  (Id.)

MetLife approved Bolt's claim for long-term disability under the "own occupation" standard effective August 24, 2003.  (Id. at MetBCF000586.) Bolt was also approved for social security disability benefits effective August 2003.  (Id. at MetBCF00071.)

In December 2003, Bolt had a pulmonary embolism resulting from a blood clot in his lung.  (Id. at MetBCF000546.)  One month later he was diagnosed with a weakened heart muscle due to inadequate blood supply and was found to have an ejection fraction of twenty-five percent.[1]  (Id. at MetBCF000541, MetBCF000521.)  The ejection fraction rose three months later to between thirty-five and forty percent and Bolt's cardiologist, Dr. Ryk Linden, noted that Bolt was "capable of doing sitting and sedentary activity but even this [was] somewhat limited based on his symptoms."  (Id. at MetBCF000538, MetBCF000520.)

_____

[1] An "ejection fraction" is the percentage of blood pumped with each heart beat.  ("Opp'n," Doc. # 47, at 3 n.1.)

4

In May 2004, Bolt submitted a Personal Profile Evaluation ("PPE") in which he described his day-to-day activities as well as his conditions. Bolt told MetLife he was unable to engage in more than twenty to thirty minutes of activity under Dr. Linden's rest orders. (Id. at MetBCF000514.) He said he slept through the day, was unable to do any work around the house and did not go shopping or driving. (Id. at MetBCF000514–16.) He responded "n/a" when asked what his hobbies were and stated that aside from his family taking him to medical appointments, he did not leave the house. (Id.)

In January 2005, MetLife requested updated information on Bolt's condition because, per the Plan, Bolt now had to demonstrated he was unable to work in "any gainful occupation" to continue receiving benefits. (Id. at MetBCF000497; see also id. at MetBPlan000022.) Bolt submitted a new PPE dated January 30, 2005, in which he reported suffering consistent with his May 2004 PPE. When asked to provide a detailed description of his daily routine, Bolt stated:

> I wake up at varied times—in the AM I get up, take care of my personal hygiene needs, take AM medication, and return to bed. In the PM I eat one meal, take meds, and return to bed.

(Id. at MetBCF000484.) He claimed to sleep so much because of the fatigue he experienced when awake and "performing minimal functions." (Id. at

MetBCF00484–86.)  He restated that he did not shop and did not drive "unless there is no other means of travel."  (Id.)  Bolt submitted an attending physician statement ("APS") from Dr. Linden which stated that Bolt could only sit two hours a day intermittently, and could not stand or walk and was unable to work.  (Id. at MetBCF000477–79.)  Dr. Linden also stated that Bolt's "activities of daily living are substantially limited by his fatigue and loss of stamina."  (Id.)  Based on these documents, MetLife approved Bolt's claim for continuing benefits under the "any occupation" standard in the plan.  (Id. at MetBCF000474.)  MetLife continued to pay benefits to Bolt for three years while receiving periodic updates on Bolt's condition.

II.   Termination of Benefits

In January 2008, MetLife received a tip on its confidential fraud hotline that Bolt was "very active and rides [his] motorcycle with [a] club."  (Id. at MetBCF000124, 135.)  MetLife referred Bolt's claim to its Special Investigations Unit and hired private investigators Bonnamy & Associates to perform surveillance on Bolt.  (Id. at MetBCF000704, 727–37.)

The first round of surveillance was conducted on January 27, 28, and 29.  (Id.)  The surveillance video, which the parties provided to the Court, shows Bolt grocery shopping.  Bolt is seen pushing a cart full of groceries to his vehicle

and helping load the back of the vehicle with groceries.  He and his companion enter the vehicle, and Bolt drives away.

After reviewing the January surveillance, MetLife conducted a second round of surveillance from February 15–17, 2008.  (See id at MetBCF000124, 135; MetBCF000743–53.)  Video surveillance from February 16, 2008 shows Bolt squatting in his garage near his motorcycle.  Video surveillance from February 17, 2008 shows Bolt driving on a seven hour and thirty minute, 170-mile motorcycle trip with a passenger and a group of friends.  The latter video shows that the group took periodic breaks during the trip.  (See id. MetBCF000364–65, 753.)

After reviewing the video surveillance, MetLife telephoned Bolt and requested further information on March 7, 2008, including an updated PPE and APS.  (Id. at MetBCF000126.)  During that phone conversation, Bolt stated that his condition had not changed.  (Id.)

One month after his motorcycle trip, Bolt completed and submitted another PPE for MetLife.  (Id. at MetBCF 000389–94.)  Bolt claimed that his medical conditions caused "fatigue, dizziness, shortness of breath, pain (foot, leg, hip, lower back, shoulders, arm, hand, neck)."  (Id.)  He described his daily activities as follows:

> Morning Hygiene, Shower, Shave, Brush Teeth, Eat Morning Snack (Toast), Lay in bed till dinner, Back to Resting, Converse with wife and sleep between 8 & 10 pm.  I make doctors appts as early in the day as possible.

(Id. at MetBCF000390.)  Bolt added that his wife drove him on trips "outside of local" but that he had "not traveled any distance recently."  (Id. at MetBCF000392.)  In response to the question of whether there had been "[a]ny change in the distance or time you travel," Bolt responded "I don't travel."  (Id.)  Bolt further stated that he was not involved in any activities or hobbies, nor was he "[a]ctive with family, church, social or other groups."  (Id. at MetBCF000392–93)  Bolt also stated that he did not shop.  (Id. at MetBCF000392.)  With his PPE, Bolt submitted another APS from Dr. Linden which stated that Bolt had severe cardiomyopathy and an ejection fraction of twenty-five percent.  (Id. at MetBCF000413.)  Dr. Linden opined that Bolt could only sit for two hours intermittently during the day and could not stand or walk more than intermittently.  (Id. at MetBCF000414.)  Dr. Linden also stated that Bolt was unable to twist, bend, or stoop due to "short[ness] of breath, fatigue, chronic severe pain, lack of stamina."  (Id.)

After receiving Dr. Linden's APS, MetLife faxed a copy of the surveillance report to Dr. Linden on April 15, 2007.  (Id. at MetBCF000131–33.)

8

MetLife explained that it did not believe that his report was consistent with the video surveillance and asked for comment. (Id.) MetLife stated that if it did not hear back within a week it would "take that to mean that your patient has the ability to do his light duty occupation as IT Manager." (Id.) Dr. Linden did not respond. (Id. at MetBCF000140.)

Subsequently a MetLife nurse consultant reviewed Bolt's claims and agreed that Bolt's activities were inconsistent with his self-reported limitations. (Id. at MetBCF000134–36.) MetLife's Claim Specialist then evaluated all the information in Bolt's claim file and concluded that he was not entitled to continuing benefits under the plan's "any occupation" standard. (Id. at MetBCF000139–40.) By letter dated May 15, 2008, MetLife notified Bolt that his benefits under the Plan were terminated. (Id. at MetBCF000386–88.) MetLife stated that Bolt "no longer met the plan definition of total disability from your job based on your observed activities of having the ability to fix, maintain and ride your motorcycle around town and on road trips." (Id.) MetLife also stated that the surveillance was inconsistent with the restrictions described in Dr. Linden's APS and Bolt's PPE. (Id.)

III.    <u>Bolt's Appeals</u>

        On or about November 5, 2008, Bolt's counsel filed a timely appeal of
the May 15, 2008 decision.  (<u>Id.</u> at MetBCF000359–62.)  Bolt included an affidavit
and additional medical records with his appeal.  (<u>Id.</u>)  Bolt explained that the
motorcycle ride was taken by a group of older adults with health issues and
stopped for breaks every hour or so.[2]  (<u>Id.</u> at MetBCF000363–66.)  Bolt also
submitted a new APS from Dr. Linden which echoed his May APS except that it
stated Bolt could only sit for one hour a day, and even then, only intermittently.
(<u>Id.</u> at MetBCF000371, 414.)  Bolt submitted further evidence, mostly from Dr.
Linden, which suggested his ejection fraction was at thirty-eight percent and that
he had decreased blood pressure when he stood up.  (<u>Id.</u> at MetBCF000377.)

        As a part of the appeal process, MetLife had a second nurse consultant
review the file.  (<u>Id.</u> at MetBCF000148–54.)  She concluded that Dr. Linden's
restrictions were inconsistent with Bolt's documented functionality.  (<u>Id.</u> at
MetBCF000153.)  MetLife also obtained an independent medical review by a
board-certified cardiologist, Dr. Michael Rosenberg, who reviewed Bolt's medical
records dating back to 2003 and the surveillance video.  (<u>Id.</u> at MetBCF000330.)

---

        [2] Bolt also explained that Dr. Linden did not respond as a result of MetLife's
"underhanded" tactics in video recording him.  (AR at  MetBCF00067.)

Dr. Rosenberg then twice attempted to contact Dr. Linden for comment but never received a response.  (Id. at MetBCF000331.)

Dr. Rosenberg subsequently issued an assessment to MetLife based on the information provided to him.  (Id. at MetBCF00033.)  The assessment reviewed Bolt's medical history and commented that it was a "complicated one." Dr. Rosenberg went on to state as follows:

> The claimant was observed working in his garage on a motorcycle repair, was noted to make fluid movements at all times, carrying items that appeared to be of moderate weight, walking freely, and carrying and loading groceries into a truck.  He was noted to ride a motorcycle, as well as drive other vehicles, and was seen to be taking a "road trip" with other motorcycle riders.  The patient remained active for many hours at a time.
>
> At all times, his movements appeared fluid, unlabored, and consistent with at least a medium level of activity, tolerating this for hours at a time.  From the surveillance videotapes made in January and February 2008, it becomes clear that the claimant was capable of doing mechanical work on his motorcycle, riding the motorcycle, loading groceries, and at least capable of medium work.  The activities observed are clearly inconsistent with the presence of an objectively assessed significant functional impairment precluding the employee from performing a sedentary or light job.

(Id. at MetBCF000332.)  Dr. Rosenberg then responded to a series of questions submitted to him by MetLife as follows:

> 1.    Does the medical information support functional limitations (physical) beyond 05/16/08 on going?  Functional limitations include any reduction in the ability to work full time.

11

Based upon the information reviewed, the medical information does not support functional limitations beyond 05/16/08. . . .

3.      If no, please describe . . .

The claimant has demonstrated fluid activity on the surveillance tapes. His ejection fraction has been stable since his unrecognized anterior wall myocardial infarction that occurred presumably in the time frame between 2003 and 2004.  His ejection fractions have been stable in the 30% to 40% range throughout that period of time and he has had no findings of congestive heart failure.  Furosemide has been discontinued.  He is not shown to have any objective evidence of ongoing myocardial ischemia.

(Id. at MetBCF000332–33.)

MetLife then faxed Dr. Rosenberg's assessment to Dr. Linden and Dr. Shockey for comment.  (Id. at MetBCF000321–24.)  Dr. Shockey responded he had not seen Bolt in over a year.  (Id. at MetBCF000326.)  Dr. Linden did not respond.

Similarly, MetLife had Dr. George Yanik, a board-certified ophthalmologist, review Bolt's file.  (Id. at MetBCF000336–40.)  Dr. Yanik began by noting that "all records referred to in the ophthalmologic records in regard to Mr. Bolt are five years old, and as such, any change in his visual status cannot be inferred or estimated based upon five-year old records."  (Id. at MetBCF000337.) Dr. Yanik went on to review Bolt's medical history before assessing the impact of the surveillance video, stating as follows:

> While [the video] shows that Mr. Bolt . . . has sufficient visual acuity
> to operate a motor vehicle at present, the objective notes which detail
> what the visual acuity is are not in evidence in the medical record.
> Additionally, the operation of a motor vehicle, either in motorcycle or
> car, does prove that he has sufficient visual activity to drive, it does
> not in itself prove he has sufficient physical stamina to return to work.
> Since driving, either a car or motorcycle, is relatively a sedentary
> activity, many patients who have significant medical impairment are
> able to do so without difficulty since very little strenuous work is
> required to operate such a vehicle.  As to the other comorbid
> conditions that Mr. Bolt experiences . . . these would best be reviewed
> by a cardiologist or internal medicine specialist more in tune with
> those diagnoses.

(Id. at MetBCF000337.)  In response to questions asked by MetLife, Dr. Yanik

responded as follows:

> 1.      Does the medical information support functional limitations
> (physical) beyond 05/16/08 on going?  Functional limitations include
> any reduction in the ability to work full time.
>
> As to his visual acuity, which is the reason for this evaluation, the
> surveillance videos do show that he has sufficient visual acuity to
> operate a motor vehicle safely, whether it be a motorcycle or a motor
> vehicle.  As to other physical limitations of a medical nature that Mr.
> Bolt may have, which include his cardiac status, these are beyond the
> scope of this review. . . .  Finally, as to Mr. Bolt's ongoing present
> visual status, this cannot be commented upon since the records I
> received for review are over five years old.
>
> 2.      If yes, specify the types of limitations the claimant would have.
> Describe the specific clinical findings/data noted in the records in
> support of functional limitations. . . .

13

What can be seen from the five-year-old record is that Mr. Bolt does have a significant impairment of vision of his left eye.  I have no doubt that this has remained as such and has not improved given the extent of damage to the macula of that eye as a result of the choroidal neovascular membrane.  As to the right eye, it is unknown to this reviewer based on the available information . . . .  Therefore, any greater specificity into the limitation [sic] his vision would be speculation and not belong in an objective report.

(Id. at MetBCF000338.)  Dr. Yanik concluded:

What can be stated from the medical record present and the surveillance video, is that Mr. Bolt does have sufficient visual acuity to operate safely a motor vehicle and/or motorcycle.  As such, whether this translates on his being able to return to work from a visual standpoint, the answer is he could return to work. [As to his cardiac status,] that will be reviewed by the cardiologist and commented upon by that specialist.

 (Id. at MetBCF000340 (emphasis added).)

MetLife also conducted an employment analysis, which identified several occupations, all sedentary, that Bolt could perform based on his education and training and that would meet the plan's eighty percent of pre-disability earnings requirement.  (Id. at MetBCF000304–05.)

By letter dated January 14, 2009, MetLife upheld its decision to discontinue Bolt's benefits.  (Id. at MetBCF000298–302.)  MetLife summarized Dr. Rosenberg and Dr. Yanik's decisions and relied upon them in reaching its conclusion.  (Id.)  MetLife, nonetheless, provided Bolt with another opportunity to

14

appeal its decision with respect to Bolt's ophthalmological condition given that the information on file was over five years old.  (See id. at MetBCF000301.)

By letter dated July 9, 2009, Bolt appealed MetLife's decision that he was not disabled based on his ophthalmological condition.  (Id. at MetBCF000282–83.)  With this letter, Bolt provided medical documentation from 2007 through 2009 which established a diagnosis of "recurrent central serous retinopathy (CSR) in the right eye and a history of vascular occlusion in the left eye."  (Id. at MetBCF000285.)  The CSR was first diagnosed in March 2003; Bolt lost the central vision of his left eye to wet abnormal macular degeneration and has had CSR in his right eye since March 2003.  (See id. MetBCF000284–97.)  Bolt's subjective complaints relating to the ophthalmic conditions, including pain and blurred vision, are similarly reflected in these retinology records.  (See id.)

In response to this appeal, MetLife referred Bolt's file to Dr. Gary Edwards, another board-certified ophthalmologist, for further independent medical review.  (Id. at MetBCF000270–73.)  Dr. Edwards reviewed and summarized the medical documentation submitted by Bolt.  (Id. at MetBCF000271.)  Dr. Edwards summarized  Bolt's 2009 visits to his own ophthalmologist, Dr. Jamie Gaitan, as follows:

On 05/04/09, [Bolt] was seen by Dr. Jaime Gaitan.  His vision then was found to be 20/30 in the right eye and 20/400 in the left eye, and there is a note made that there is a suspicion of fluid near the optic nerve in the right eye.  His last visit was on 6/15/09 by Dr. Gaitan.  He found no [CSR] in the right eye and poor vision in the left eye due to old choroidal neovascularization effects in the left.  The visions at that time were 20/30 in the right and counting fingers of two feet in the left.

(Id. at MetBCF000271.)  Dr. Edwards also reached out to Dr. Gaitan who opined that Bolt "was able to function in his original job as far as his ophthalmological status [] was concerned."  (Id.)  In response to MetLife's specific questions, Dr. Edwards responded as follows:

1.      Does the medical information support functional limitations (physical) beyond 05/16/08 on going?  Functional limitations include any reduction in the ability to work full time.

No. . .

3.      If no, please describe . . .

The patient works at a sedentary job as an IT manager.  This involves looking at a computer monitor.  He has good vision in his remaining right eye compatible with doing this type of work.  In fact, there are blind people who do excellent IT work.

(Id. at MetBCF000272.)  Dr. Edwards concluded that Bolt "has had numerous visits with the retinologists.  They all support the fact that he has very good vision in his right eye and poor vision in his left eye.  This is compatible with working at sedentary work."  (Id. at MetBCF000273.)

16

On August 20, 2009, MetLife upheld its May 15, 2008 termination of

Bolt's benefits.  (Id at MetBCF000257.)

On January 13, 2010, Bolt filed his Complaint with this Court.

(See Doc. # 1.)  On September 27, 2010, Bolt filed the instant Motion for

Summary Judgment ("Motion").  ("Mot.," Doc. # 41.)  On December 6, 2010,

MetLife filed its Response to the Motion.  ("Resp.," Doc. # 47.)  On December 29,

2010, Bolt filed his Reply.  ("Reply," Doc. # 51.)

<u>STANDARD OF REVIEW</u>

Under ERISA § 502, a beneficiary or plan participant may sue in

federal court "to recover benefits due to him under the terms of his plan, to enforce

his rights under the terms of the plan, or to clarify his rights to future benefits

under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B); <u>see also</u> <u>Aetna Health</u>

<u>Inc. v. Davila</u>, 542 U.S. 200, 210 (2004).  The ususal legal standard for summary

judgment motions does not apply where the Court is asked to review an ERISA

plan administrator's decision.  <u>Harlick v. Blue Shield of Cal.</u>, --- F.3d ---, 2011 WL

3796177, at * 4 (9th Cir. August 26, 2011); <u>see also</u> <u>Bendixen v. Standard Ins. Co.</u>,

185 F.3d 939, 942 (9th Cir. 1999) (overruled on other grounds by <u>Abatie v. Alta</u>

<u>Health & Life Ins. Co.</u>, 458 F.3d 955, 965 (9th Cir. 2006) (en banc)).  Instead, a

motion for summary judgment is "merely the conduit to bring the legal question

before the district court and the usual tests of summary judgment . . . do not apply."
Bendixen, 185 F.3d at 942.

A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 629 (9th Cir. 2009). If the plan confers such discretion, then the denial is reviewed for an abuse of discretion. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 110–11 (2008) ("Glenn ").

"Commonly, . . . the same entity that funds an ERISA benefits plan also evaluates claims, as is the case here." Montour, 588 F.3d at 630 (citing Glenn, 489 U.S. at 108, 111–12). In these circumstances "the plan administrator faces a structural conflict of interest: since it is also the insurer, benefits are paid out of the administrator's own pocket, so by denying benefits, the administrator retains money for itself." Id. "[A] reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." Id. (citing Glenn, 489 U.S. at 108, 111–12). The existence of a conflict, however, does not alter the standard of review, but instead affects only its application. Id. at 631; see also

18

<u>Saffon v. Wells Fargo & Co. Long Term Disability Plan</u>, 522 F.3d 863, 868 (9th Cir. 2008). If a conflict exists, "abuse of discretion review applies" and "that conflict must be weighed as a factor in determining whether there was an abuse of discretion." <u>Abatie</u>, 458 F.3d at 965 (internal quotation marks and alteration omitted); <u>see also</u> <u>Harlick</u>, 2011 WL 3796177, at *4. In effect, the review the court conducts will be "tempered by skepticism." <u>Harlick</u>, 2011 WL 3796177, at *4.

An administrator can mitigate a conflict "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." <u>Glenn</u>, 554 U.S. at 117. In addition, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference . . . ." <u>Abatie</u>, 458 F.3d at 972 (internal quotation marks omitted).

In sum, then, a "court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." <u>Montour</u>, 588 F.3d at 630 (citing <u>Glenn</u>, 128 S. Ct. at 116–19). Factors that frequently arise in the ERISA context include whether the fiduciary failed to

investigate a claim adequately or ask the plaintiff for necessary evidence, whether the fiduciary failed to credit a claimant's reliable evidence, and whether the fiduciary's decision is against the weight of evidence in the record.  Abatie, 458 F.3d at 972.  Other factors courts have found relevant include whether the administrator acknowledged or distinguished a contrary disability determination by the Social Security Act ("SSA"), Glenn, 554 U.S. at 118, whether the administrator presented outside medical reviewers with all the relevant evidence, id., and whether the administrator conducted an in-person medical evaluation or relied instead on a paper review,  Montour, 588 F.3d at 630.

DISCUSSION

I.      Structural Conflict

The parties spend much of their briefing debating the extent to which the Court should afford deference to MetLife's decision because it operated under a structural conflict of interest.  (See Mot. at 6; Resp. at 13–17; Reply at 2.) Plaintiff contends that because MetLife was both the Plan administrator and insurer, it operated under a structural conflict of interest—i.e. MetLife both paid benefits and decided whether to issue benefits.  (Mot. at 6.)  As a result, according to Plaintiff, "the court is required to weigh a conflict of interest as a factor in abuse of discretion review" and "must not be so deferential to MetLife in determining if

20

MetLife's decision to terminate Bolt's . . . benefits was arbitrary and capricious."
(<u>Id.</u>)  MetLife, for its part, argues that this factor is "less important" and that there
"is simply no basis to afford the mere structural conflict of interest any weight."
(Resp. at 16.)

   The presence of a structural conflict, as here, is only one of many
factors a Court considers.  <u>Montour</u>, 588 F.3d at 630 (holding that a "court must
consider numerous case-specific factors, including the administrator's conflict of
interest, and reach a decision as to whether discretion has been abused by weighing
and balancing those factors together.").  While the structural conflict factor <u>must</u> be
considered by a court, <u>see id.</u> at 626 ("a reviewing court <u>must</u> take into account the
conflict" (emphasis added)), how much weight this factor is afforded depends on
the facts and circumstances of the case.  <u>See</u> <u>Glenn</u>, 554 U.S. at 126 ("The conflict
of interest . . . should prove more important (perhaps of great importance) where
circumstances suggest a higher likelihood that it affected the benefits decision . . . .
It should prove less important (perhaps to the vanishing point) where the
administrator has taken active steps to reduce potential bias and to promote
accuracy, for example, by walling off claims administrators from those interested
in firm finances, or by imposing management checks that penalize inaccurate
decision making irrespective of whom the inaccuracy benefits."); <u>see also</u> <u>Abatie</u>,

458 F.3d at 968 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence . . . ." (internal citations omitted)).

Here, MetLife has produced evidence, which Plaintiff has not disputed, that suggests the structural conflict "should prove less important" and "perhaps [reach] the vanishing point." Glenn, 554 U.S. at 126.  MetLife has taken steps to minimize any bias that may arise from the structural conflict of interest. As described in a declaration provided by MetLife to the Court:

> MetLife's finances are kept completely separate from claims.
> MetLife's claims offices are geographically separate from its finance offices.
> Claims specialists do not report up to Finance Department employees.
> Finance Department employees do not make, direct, or have any association with claim determinations.
> Claims specialists do not have access to claim reserve information

> Claims specialists receive no compensation, awards, bonuses, other financial benefits or performance recognition based upon either the value or the number of the claims they deny or terminate
>
> Claims determinations are expected to be accurate regardless of the outcome of the determination.
>
> MetLife administers all claims consistently, regardless of whether the plan is funded by the employer or by MetLife.

("Hafner Decl.," Doc. # 48-1, at 2.)  The declaration makes clear that MetLife has taken steps to reduce the impact of the structural bias as the Court in <u>Glenn</u> contemplated.  554 U.S. at 126 ("The conflict of interest . . . should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances , or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits.").  Indeed, Plaintiff has not pointed to any evidence which suggests that malice, self-dealing, or a parsimonious claims-granting history was at issue here, and, accordingly, the Court views MetLife's structural conflict with a low level of skepticism.  <u>See</u> <u>Abatie</u>, 458 F.3d at 968 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of

malice, of self-dealing, or of a parsimonious claims-granting history.").[3]  In sum,

the Court has considered the impact of the structural bias here and, while cognizant

of it, concludes that it should not be afforded much weight in determining whether

MetLife abused its discretion in denying Bolt's benefits.

II.     Abuse of Discretion

As outlined above, MetLife discontinued Bolt's benefits because it

found that Bolt's cardiac and ophthalmic conditions did not suffice to qualify Bolt

as disabled as defined in the Plan.[4]  (AR at MetBCF000301.)  Bolt argues that

"MetLife did not undertake a full and thorough review of Bolt's records, and

instead based its decision on the surveillance video and report, which is insufficient

to support MetLife's decision that Bolt is capable of work" and therefore abused its

discretion.  (Mot. at 7.)  The Court is not persuaded.

---

[3] Similarly, the Ninth Circuit has stated that a court should weigh a conflict more heavily if the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, has repeatedly denied benefits to deserving participants, or makes decisions against the weight of the evidence in the record. Abatie, 458 F.3d at 968.  None of these hallmarks of bias stemming from a structural conflict are present here.  As discussed, infra, the record instead reflects that MetLife took steps to avoid these potential pitfalls; MetLife's actions were consistent with those of a disinterested plan administrator.

[4] More than two years after the onset of the medical condition, disabled as defined in the plan means the insured's inability to perform any gainful occupation for which the insured is reasonably qualified.  (AR at MetBPlan000022.)

24

A.    <u>Cardiac Condition</u>

MetLife did not abuse its discretion in concluding that Bolt's cardiac condition did not qualify him as disabled within the meaning of the Plan.

First, MetLife received an anonymous tip stating that Bolt was "very active" and regularly took motorcycle trips with a club.[5]  (<u>Id.</u> at MetBCF000124, 135.)  It is clear here that MetLife did not on its own begin an investigation of Bolt in the hopes of finding "something" upon which to deny his claims.  Bolt's inconsistent actions were rather independently reported to MetLife by a third party.

MetLife then hired a private party to investigate Bolt and video surveillance revealed that Bolt was in fact fully capable of grocery shopping, as well as taking a <u>seven and one-half hour day trip</u> on his motorcycle which covered <u>170 miles</u>.

<u>After</u> the video surveillance was recorded, MetLife asked for an updated PPE from Bolt.  (<u>Id.</u> at MetBCF000126.)  At best, Bolt's response can be characterized only as misleading.  Bolt claimed that his medical conditions caused "fatigue, dizziness, shortness of breath, pain (foot, leg, hip, lower back, shoulders,

---

[5] This illustrates that MetLife did not on its own begin an investigation into Bolt in the hopes of finding something with which to deny his claim.  Bolt's activities were rather independently reported to MetLife by a third-party.

25

arm, hand, neck)." (<u>Id.</u> at MetBCF 000389–94.) He described his daily activities

as follows:

> Morning Hygiene, Shower, Shave, Brush Teeth, Eat Morning Snack
> (Toast), Lay in bed till dinner, Back to Resting, Converse with wife
> and sleep between 8 & 10 pm.  I make doctors appts as early in the
> day as possible.

(<u>Id.</u> at MetBCF000390.)  Bolt added that his wife drove him on trips "outside of

local" but that he had "not traveled any distance recently."  (<u>Id.</u> at

MetBCF000392.)  In response to the question of whether there had been "[a]ny

change in the distance or time you travel," Bolt responded "I don't travel."  (<u>Id.</u>)

Bolt further stated that he was not involved in any activities or hobbies, nor was he

"[a]ctive with family, church, social or other groups."  (<u>Id.</u> at MetBCF000392–93)

Bolt also stated that he did not shop.  (<u>Id.</u> at MetBCF000392.)

Dr. Linden's updated APS was similarly out of sync with the video

surveillance.  The APS stated that Bolt had severe cardiomyopathy and an ejection

fraction of 25 percent.  (<u>Id.</u> at MetBCF000413.)  Dr. Linden opined that Bolt <u>could</u>

<u>only sit for two hours intermittently</u> during the day and <u>could not stand or walk</u>

<u>more than intermittently</u>.  (<u>Id.</u> at MetBCF000414.)  Dr. Linden also stated that Bolt

was unable to twist, bend, or stoop due to "short[ness] of breath, fatigue, chronic

severe pain, lack of stamina." (Id.)  When asked to comment on the video

surveillance report, Dr. Linden did not respond.[6]

Across the investigative and appeal process, MetLife also had two

nurse consultants as well as one board certified cardiologist, Dr. Rosenberg, review

Bolt's entire file.  Both nurse consultants concluded that Bolt's functionality was

inconsistent with his most recently reported medical information.  (See id. at

MetBCF000134–36; MetBCF000148–54.)  Dr. Rosenberg concluded similarly.

He reviewed and outlined Bolt's medical history, including the most up to date

information provided to MetLife by Bolt and his physician, Dr. Linden.  (Id. at

MetBCF000331.)  Acknowledging the case was complicated, Dr. Rosenberg found

that "the medical information does not support functional limitations beyond

05/16/08 . . . ."  (Id. at MetBCF000332–33.)  Dr. Rosenberg explained that his

finding was based on the following facts:

---

[6]  Indeed, beginning in 2007 and during the course of the investigation and
appeal process MetLife as well as the independent medical investigators reached
out to Dr. Linden no fewer than four times for comment on his various APS reports
due to the inconsistency between the reports and the video surveillance MetLife
obtained.  (See id. at MetBCF000140, MetBCF000331, MetBCF000321–24.)  Dr.
Linden did not once respond or in anyway attempt to explain or justify his
opinions.

> The claimant has demonstrated fluid activity on the surveillance tapes. His ejection fraction has been stable since his unrecognized anterior wall myocardial infarction that occurred presumably in the time frame between 2003 and 2004.  His ejection fractions have been stable in the 30% to 40% range throughout that period of time and he has had no findings of congestive heart failure.  Furosemide has been discontinued.  He is not shown to have any objective evidence of ongoing myocardial ischemia.

(Id. at MetBCF000332–33.)  Dr Rosenberg ultimately concluded that Bolt was capable of engaging in sedentary or light work.  Relying on Dr. Rosenberg's analysis, the video, the anonymous tip, and the review conducted by the two nurse consultants, MetLife concluded that Bolt's cardiac condition did not render him incapable of engaging in light or sedentary work.

B.    Ophthalmic Condition

MetLife did not abuse its discretion in concluding that Bolt's opthalmic condition did not qualify him as disabled within the meaning of the Plan.

As outlined above, MetLife received an anonymous tip, obtained video surveillance of Bolt on a motorcycle day trip, and had two nurse consultants conclude that Bolt's ophthalmic condition did not render him incapable of working.  Bolt also had two independent board-certified ophthalmologists as well as his own ophthalmologist conclude that Bolt was capable of working.

28

Dr. Yanik, the first independent board-certified opthamologist,

expressed concern over the age of the medical records at his disposal, noting that

"all records referred to in the ophthalmologic records in regard to Mr. Bolt are five

years old, and as such, any change in his visual status cannot be inferred . . . ."

(AR at MetBCF000337.)  As a result, Dr. Yanik concluded, in part, that "as to Mr.

Bolt's ongoing present visual status, this cannot be commented upon since the

records I received for review are over five years old."  (Id. at MetBCF000338.)

Dr. Yanik qualified this conclusion by also finding that "[w]hat can be stated from

the medical record present and the surveillance video, is that Mr. Bolt does have

sufficient visual acuity to operate safely a motor vehicle and/or motorcycle.  As

such . . . from a visual standpoint . . . he could return to work."[7]  (Id. at

MetBCF000340 (emphasis added).)

MetLife, rather than just accepting Dr. Yanik's conclusion that Bolt

could return to work, nonetheless provided Bolt another opportunity to appeal its

---

[7] Dr. Yanik also cautioned that "driving, either a car or motorcycle, is relatively a sedentary activity, many patients who have significant medical impairment are able to do so without difficulty since very little strenuous work is required to operate such a vehicle."  (Id. at MetBCF000337.)  Dr. Yanik also explicitly stated, however, that these conditions "would best be reviewed by a cardiologist or internal medicine specialist more in tune with those diagnoses." (Id.)  In this case, as discussed, Dr. Rosenberg, a board certified cardiologist, reviewed the record and concluded that Bolt was capable of working.

findings with respect to this conclusion and to submit further documentation.[8]  (See id. at MetBCF000301.)  Bolt so appealed and MetLife retained another board-certified ophthalmologist, Dr. Edwards, to conduct another independent medical review.  Dr. Edwards reviewed the updated documentation and contacted Bolt's own ophthalmologist, Dr. Gaitan, who opined that Bolt "was able to function in his original job as far as his ophthalmological status [] was concerned."  (Id. at MetBCF000271.)  Dr. Edwards concluded similarly.  (Id. at MetBCF000271–73.)  Relying on the opinions of Dr. Yanik, Dr. Edwards, Dr. Gaitan, the anonymous tip, and the review conducted by the two nurse consultants, MetLife concluded that Bolt's ophthalmic condition did not render him incapable of engaging in light or sedentary work.

     C.    <u>Employment Analysis</u>

         Finally, MetLife conducted an employment analysis which identified several occupations, all sedentary, that Bolt could perform based on his education and training which would meet the plan's eighty percent of pre-disability earnings requirement.  (Id. at MetBCF000304–05.)  Given that all three board certified

---

[8] Indeed, this is one instance where the record is clear that MetLife's structural bias had little impact on MetLife's ultimate decision.  Rather than just resting on Dr. Yanik's conclusion that Bolt could work and outright deny the benefits, MetLife instead provided Bolt another opportunity to appeal its decision and submit up-to-date ophthalmic documentation in support.

M.D.s who reviewed Bolt's file concluded that Bolt was capable of doing sedentary work, MetLife concluded that Bolt was not disabled as defined in the Plan.[9]

Based on the evidence outlined above, the Court cannot conclude that MetLife abused its discretion in determining that Bolt no longer qualified as "disabled" as defined in the Plan and thereafter terminating his benefits.

III.    Bolt's Arguments

A recurring theme in Plaintiff's briefing is that MetLife and Dr. Rosenberg "did not speak with or meet with either Mr. Bolt or his cardiologist, Dr. Linden," (Mot. at 7), and that MetLife did not "give [Dr. Linden] a reasonable time frame to respond." (Reply at 3.) The Court is not persuaded.

As noted, MetLife and Dr. Rosenberg reached out to Dr. Linden four times for comment. Dr. Linden never responded. Neither Dr. Rosenberg nor MetLife can be faulted for Dr. Linden's failure to respond to their repeated requests for comment. Indeed, Bolt's attempts to fault MetLife for failing to obtain the views of Dr. Linden is disingenuous at best.

---

[9] After the first twenty-four months, disability is defined as the insured's ability to perform any gainful occupation for which the insured is reasonably qualified. (AR at MetBPlan000022.)

Bolt also complains that the timing of MetLife's request for comment from Dr. Linden was unreasonable because MetLife sent "its reports to [Dr. Linden] a week before Christmas, with a demand for response by Christmas Eve." (Mot. at 11; see also Reply at 3.)  While it is true that MetLife sent its final request for comment on the report provided by Dr. Rosenberg in the midst of the holiday season, Plaintiff overlooks the fact that this was the <u>fourth</u> request for comment from Dr. Linden.  Given Dr. Linden's repeated failure to respond to MetLife's inquiries into Bolt's condition, the Court cannot conclude that MetLife acted unreasonably in providing Dr. Linden the opportunity to comment for the fourth time during the holiday season.[10]

Plaintiff attempts to explain away Dr. Linden's repeated failure to respond as disgust at MetLife's  "underhanded" tactics in video recording him. (AR at MetBCF00067.)  This explanation is misguided for multiple reasons.  First, video surveillance is widely accepted as a means of investigating potentially fraudulent ERISA claims.  <u>See, e.g.</u>, <u>Lacour v. Life Ins. Co of N. Am.</u>, 200 F. Supp. 2d 622, 626 (W.D. La. 2002); <u>Mote v. Aetna Life Ins. Co.</u>, 502 F.3d 601,

---

[10] Indeed, even if MetLife had not sought comment from Dr. Linden on Dr. Rosenberg's report, the Court would be hard pressed to find such conduct unreasonable given Dr. Linden's repeated failure to cooperate with the investigation.

609–10 (7th Cir. 2007); <u>Giertz-Richardson v. Hartford Life & Accident Ins. Co.</u>, F.

Supp. 2d 1280, 1292 (M.D. Fla. 2008).  In any event, even assuming Dr. Linden

refused to cooperate with MetLife's investigation because of the alleged

"underhanded" tactics of video recording Bolt, MetLife was under no obligation to

accept the veracity of Dr. Linden's report, especially in light of the video

surveillance and the assessments of Dr. Rosenberg, Dr. Yanik, Dr. Edwards, and

Bolt's own physician, Dr. Gaitan.  <u>See</u> <u>Black & Decker Disability Plan v. Nord</u>,

528 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators

automatically to accord special weight to the opinions of a claimant's physician.").

In short, MetLife did not abuse its discretion by failing to confer with Dr. Linden

before terminating Plaintiff's benefits.

   Bolt also complains that MetLife's May 15, 2008 initial letter

terminating Bolt's benefits was based solely on the video and that MetLife abused

its discretion by never explicitly stating "<u>why</u> the reviewer determined that the

video was entitled to greater weight than the statements of Bolt or the reports of his

treating cardiologist."  (Mot. at 7.)  Bolt, however, provides no support for the

proposition that a plan administrator must explain why it discredited the evidence

provided by Bolt or Dr. Linden.  In fact, relevant case law makes clear that

MetLife has no special duty to so explain.  <u>See</u> <u>Black & Decker</u>, 528 U.S. at 834

(holding that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").  Moreover, the evidence and chronology make clear why MetLife favored the video evidence over the evidence submitted by Bolt or Dr. Linden.  After obtaining the surveillance video which showed Bolt working on his motorcycle, going grocery shopping, and taking a seven-and-a-half hour motorcycle ride, MetLife reached out to Bolt to ask for another APS and PPE. Bolt, as discussed, grossly misrepresented the impact of his conditions on his every day life, severely undercutting his credibility.  (See AR at MetBCF000389–94.) Similarly, Dr. Linden's report flatly stated that Bolt could at most only sit for two hours intermittently during the day and could not stand or walk more than intermittently.  (Id. at MetBCF000414.)  Moreover, Dr. Linden stated that Bolt was unable to twist, bend or stoop due to "shortness of breath, fatigue, chronic sever pain, [and] lack of stamina."  (Id.)  Plainly Dr. Linden's report and Bolt's self-reporting were clearly inaccurate in light of the video surveillance.  MetLife was well within its rights to determine Bolt's evidence was not probative of Bolt's actual condition.

            In any event, MetLife did not simply rely upon the video surveillance in reaching its conclusion.  With respect to Bolt's cardiac condition, MetLife relied

primarily on Dr. Rosenberg's report which, as discussed, cited a variety of reasons for concluding Bolt was capable of sedentary work.  (Id. at MetBCF000332–33.) With respect to Bolt's ophthalmic condition, MetLife relied upon the opinions of Dr. Yanik,  Dr. Edwards, and Bolt's own physician, Dr. Gaitan to determine Bolt was capable of light or sedentary work.  (Id. at MetBCF000271–73; MetBCF000340.)

Plaintiff complains that MetLife did not "[d]iscuss with Bolt the video surveillance or termination of benefits."  (Reply at 2.)  This assertion, however, is belied by the record.  As discussed, Bolt requested an updated PPE from Bolt after the video surveillance in which Bolt could have explained his trip.[11]  Moreover, as Bolt recognizes in his briefing, during his appeal he submitted an affidavit explaining "in great detail all of his activities on the video surveillance."  (Mot. at 8.)  Instead, it seems Bolt's real complaint here is not that MetLife did not provide Bolt the opportunity to explain himself, but that MetLife did not afford Bolt's explanation sufficient weight.  (See id. at 10.)  The Court, however, cannot conclude MetLife abused its discretion in giving little weight to Bolt's self-serving

---

[11] MetLife was certainly under no obligation to show Bolt the video first and then ask for comment.

affidavit, especially in light of his misrepresentations on the PPE he filled out immediately after MetLife obtained the video surveillance.

In sum, Bolt's arguments are without merit.

IV.   ERISA Factors

As noted, a "court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together." Montour, 588 F.3d at 630 (citing Glenn, 128 S. Ct. at 116–19).  Factors that frequently arise in the ERISA context include whether the fiduciary failed to investigate a claim adequately or ask the plaintiff for necessary evidence, whether the fiduciary failed to credit a claimant's reliable evidence, and whether the fiduciary's decision is against the weight of evidence in the record.  Abatie, 458 F.3d at 972.  Other factors courts have found relevant include whether the administrator acknowledged or distinguished a contrary disability determination by the SSA, Glenn, 554 U.S. at 118, whether the administrator presented outside medical reviewers with all the relevant evidence, id., and whether the administrator conducted an in-person medical evaluation or relied instead on a paper review, Montour, 588 F.3d at 630.

The Court finds that these factors weigh in favor of concluding that MetLife did not abuse its discretion.  The Court has already addressed the first two factors.  With respect to the first, the impact of the structural conflict of interest, the Court concludes for the reasons discussed <u>supra</u> that it should be afforded little weight.  With respect to the second factor, whether MetLife sufficiently investigated the claim, the Court concludes that, as outlined above, MetLife's investigation was sufficient.

The third factor, whether MetLife asked the plaintiff for necessary evidence, also weighs in favor of finding MetLife did not abuse its discretion.  During Bolt's first appeal, Dr. Yanik explained that the ophthalmological record was incomplete because it included information that was five years old.  Dr. Yanik nonetheless concluded Bolt was capable of working.  MetLife, rather than just terminating the benefits, provided Bolt with another opportunity to appeal and invited Bolt to submit as much up-to-date evidence as he saw fit.  MetLife then reviewed that evidence before reaffirming its earlier decision.

The Court finds the next factor, whether MetLife failed to give due consideration to credible evidence, also weighs in favor of finding MetLife did not abuse its discretion.  Bolt did not provide MetLife with any evidence it had to find

37

credible.  As outlined, Dr. Linden's APS reports were dramatically out of step with the video surveillance as well as the other doctors' assessments.  Moreover, MetLife permissively found that Bolt had little credibility in light of the misrepresentations on his PPE which he provided immediately after the video surveillance.  In sum, Bolt provided little credible evidence to which MetLife should have given weight

The next factor, whether the administrator acknowledged or distinguished a contrary disability determination by the SSA, does not weigh in favor of finding an abuse of discretion.  While it is true that Bolt has qualified for benefits under the SSA, as MetLife points out in its briefing, the SSA made this determination before MetLife undertook its investigation into Bolt.  Accordingly, the SSA may very well have based its decision on Dr. Linden's APS reports as well as Bolt's PPEs without the benefit of the video surveillance and subsequent investigation.

Whether the administrator presented outside medical reviewers with all the relevant evidence also weighs in favor of finding that MetLife did not abuse its discretion.  MetLife provided the entire file to each of its board-certified

38

doctors.  When one, Dr. Yanik, protested that some of the information was outdated, MetLife reached out to Bolt to provide up-to-date information.  This factor weighs in favor of finding that MetLife did not abuse its discretion.

The final factor, whether MetLife conducted a paper only review, is the only factor which can be said to weigh in Bolt's favor. The Court, however, cannot conclude, looking at all the evidence before it and weighing all the appropriate factors, that MetLife abused its discretion based on this factor alone.

V.    Attorney's Fees

In his Motion, Bolt also requested an award of attorney's fees.  (Mot. at 13–14.)  The Court finds that this request was premature as the Court had not yet reached a decision on Bolt's Motion for Summary Judgment when it was filed. Accordingly, the Court **DENIES WITHOUT PREJUDICE**, Bolt's request for an award of attorney's fees.  Bolt is invited to refile his request, if he so chooses, in light of the Court's decision to deny his Motion for Summary Judgment.

CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff Timothy

Bolt's Motion for Summary Judgment (Doc. # 41).  The Court also **DENIES**

**WITHOUT PREJUDICE** Plaintiff's Request for an Award of Attorney Fees.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 9, 2011.

_____
DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE

Bolt v. Honeywell International, Inc., et al., CV. NO. 10-00071 DAE-RLP;
ORDER: (1) DENYING PLAINTIFF TIMOTHY BOLT'S MOTION FOR
SUMMARY JUDGMENT AND (2) DENYING WITHOUT PREJUDICE
PLAINTIFF TIMOTHY BOLT'S REQUEST FOR AN AWARD OF ATTORNEY
FEES